UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CRIMINAL ACTION NO. 3:13-CR-00154-TBR

UNITED STATES OF AMERICA                                              Plaintiff

v.

ERIC M. THOMAS                                                        Defendant

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant Eric Thomas's Motion to Suppress. (Docket No. 18.) Thomas filed his initial Memorandum in support of his Motion on February 5, 2014. (Docket No. 22.) On March 20, 2014, the Court held a suppression hearing in Louisville, Kentucky. (Docket No. 26.) The transcript of that hearing appears in the record at Docket No. 36. During the suppression hearing, the United States presented evidence through the testimony of Taylorsville Police Chief Toby Lewis and Campbellsville Police Detective Travis Begley. The United States thereafter filed its Response to Thomas's Motion on June 9, 2014. (Docket No. 35.) Pursuant to the Court's Order of May 8, 2014, any reply by Thomas was due no later than June 16, 2014. (*See* Docket No. 33.) On June 25, 2014, the Court entered a Memorandum Opinion and Order denying Thomas's Motion to Suppress. (Docket No. 38.) After that Order was entered, Thomas filed a Motion requesting an extension of time to file a reply. (Docket No. 39.) The Court granted that Motion and vacated its June 25 Memorandum Opinion and Order. (Docket No. 41.) Thomas's Reply was then filed on June 26, 2014. (Docket No. 42.) As such, this

matter now is fully briefed and ripe for adjudication.  For the reasons that follow, Thomas's Motion to Suppress will be DENIED.

BACKGROUND

On July 12, 2013, Taylorsville Police Chief Toby Lewis stopped Defendant Eric Thomas in Taylorsville, Kentucky, for failure to wear his seat belt.  Upon approaching the vehicle, Chief Lewis smelled marijuana and observed plant starter trays in the backseat of Thomas's vehicle.[1]  When Chief Lewis inquired about the marijuana smell, Thomas produced a small marijuana cigarette from his right shorts pocket.  Chief Lewis then asked Thomas to step out of the vehicle and took the marijuana cigarette from him.  After stepping out of the vehicle, Thomas produced a marijuana bud from his left shorts pocket.  Chief Lewis then radioed for backup, and Officer Daniel Wills arrived at the stop moments later.

Chief Lewis then advised Thomas of his *Miranda* rights.  Chief Lewis asked for, and Thomas gave, consent to search his vehicle.[2]  A search of Thomas's vehicle revealed some fifteen bags of potting soil, sticks to prop up plants, fertilizer, and a grow-light bulb.[3]  Chief Lewis issued Thomas a citation for failure to wear a seat belt and possession of marijuana and then released him.

Chief Lewis thereafter contacted the Marion County Sheriff's Office and the Kentucky State Police to relay his findings from the traffic stop. Detective Travis

---

[1] A photograph of the plant starter trays in Thomas's backseat was introduced as Government Exhibit 1 at the suppression hearing.

[2] Audio recordings of the exchange between Chief Lewis and Thomas were introduced as Government Exhibit 2 at the suppression hearing.  Chief Lewis's testimony regarding the stop and Thomas's giving consent to search the vehicle is corroborated by these audio recordings.

[3] A photograph of the trunk of Thomas's vehicle was introduced as Government Exhibit 3 at the suppression hearing.

Begley received information later that day from Detective Byron Richardson, who relayed to Detective Begley that Officer Alan Corbett had received several past complaints about Thomas engaging in an indoor marijuana growing operation. Detective Begley is employed by the Campbellsville Police Department and is assigned to the Kentucky State Police Drug Task Force. Detective Begley had driven past Thomas's property and observed a large sheet metal fence that obstructed the view of that property. Detective Begley also was aware that Thomas kept guard dogs at the property. Detective Begley spoke to Chief Lewis later that day via telephone.

Detective Begley then called the Commonwealth Attorney's office in Campbellsville to request a subpoena for the electrical records for Thomas's property.[4] Detective Begley testified that, in his experience, indoor marijuana growing operations tend to have high electrical bills due to the electrical items used in the growing operation. The Marion Circuit Court Clerk issued the requested subpoena to Detective Begley later that day. Detective Begley then served the subpoena on Inter County Energy employees and received the requested records. Inter County Energy employees told Detective Begley that Thomas and a young female typically paid cash for Thomas's electrical charges and would often pay more than the charges listed on his bills. Detective Begley also learned that Inter County Energy employees thought Thomas's electrical bills appeared high.

On the basis of the information gathered up to that point, Detective Begley sought a search warrant for Thomas's property. After finding probable cause, Marion

---

[4] A copy of the subpoena duces tecum was introduced as Government Exhibit 4 at the suppression hearing.

County District Judge Allan Ray Bertram issued a search warrant for Thomas's property.[5] Detective Begley executed the search warrant that same day and seized, among other things, two garbage bags of marijuana, a box of unprocessed marijuana, several zip-lock bags of processed marijuana, growing equipment, listening devices, surveillance equipment, and digital scales. Police also seized roughly 800 marijuana plants.

DISCUSSION

Thomas moves to suppress all evidence gathered as a result of the search of his person, vehicle, and residence, as well as evidence of his utility records. Thomas argues that this evidence was unlawfully obtained because (1) the search of his vehicle was not incident to a lawful arrest and was without his consent; (2) the search warrant for his property was invalid insofar as it was obtained using evidence from the illegal traffic stop and based on an improper grand jury subpoena; and (3) even considering the evidence illegally obtained, there was still insufficient evidence to establish probable cause for the search of his property.

**I.     The Traffic Stop and Search of Thomas's Vehicle Both Were Lawful.**

Chief Lewis had probable cause for the initial traffic stop of Thomas's vehicle. The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. An officer has probable cause to stop a vehicle when he observes a driver violate a traffic law. *See Whren v. United States*, 517 U.S. 806, 810 (1996). "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was

---

[5] A copy of the search warrant and Detective Begley's affidavit in support thereof were introduced as Government Exhibit 5 at the suppression hearing.

occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993). Kentucky law prohibits an individual from operating a motor vehicle on public roadways unless the driver is wearing a properly fastened seat belt. *See* Ky. Rev. Stat. § 189.125(6). It follows that Chief Lewis had probable cause to stop Thomas when he observed Thomas driving without a seat belt in violation of Kentucky law. *See United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) (holding that no Fourth Amendment violation occurred where officers had probable cause to stop driver for failure to wear a seat belt). Therefore, because the initial traffic stop was made with probable cause, no Fourth Amendment violation occurred.

It is clear from the evidence presented at the suppression hearing that Chief Lewis also had probable cause to search Thomas's vehicle. Chief Lewis smelled marijuana and, upon questioning Thomas about that smell, Thomas produced a marijuana cigarette followed by a marijuana bud. Chief Lewis also observed plant starter trays in plain view in the backseat of Thomas's car. Chief Lewis testified that, in his experience, grow trays such as these were consistent with a possible indoor marijuana growing operation. Therefore, Chief Lewis had probable cause to believe that Thomas's vehicle contained contraband. *See, e.g.*, *Carroll v. United States*, 267 U.S. 132, 149 (1925) ("[I]f the search and seizure without a warrant are made upon probable cause, that is, upon a belief . . . known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid."); *United States v. Puckett*, 422 F.3d 340, 343 (6th Cir. 2005) ("After the stop, [the officer] smelled and saw in open view

the marijuana in the seat. Therefore, there was probable cause to search the car at that point."); *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004) ("[W]hen the officers detected the smell of marijuana coming from [the defendant's] vehicle, this provided them with probable cause to search the vehicle without a search warrant.").

But regardless whether Chief Lewis had probable cause, Thomas consented to the search. A search is not unreasonable under the Fourth Amendment if an individual gives free and voluntary consent for that search. *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "The government bears the burden of proving, through 'clear and positive testimony' that the consent to search was given voluntarily." *Id.* (quoting *United States v. Salvo,* 133 F.3d 943, 953 (6th Cir. 1998)). Chief Lewis testified unequivocally that Thomas consented to the search of his vehicle. That testimony is corroborated by the audio recordings of the exchange between Chief Lewis and Thomas. There is nothing to indicate that Thomas's consent was anything other than knowing, intelligent, and voluntary. Thus, the Court finds that the United States has met its burden of showing that Thomas voluntarily consented to the search of his vehicle.

Accordingly, the Court finds no constitutional defect in either the initial stop or subsequent search of Thomas's vehicle that would warrant suppression.

**II.     Thomas Lacks Standing to Challenge the Validity of the Subpoena.**

Thomas next challenges the grand jury subpoena issued to Inter County Energy as illegally obtained. Thomas, however, lacks standing to challenge the

validity of this third-party subpoena. In *United States v. Miller*, the Supreme Court wrote:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

425 U.S. 435, 443 (1976) (citations omitted). The *Miller* Court further recognized "the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time . . . the subpoena is issued." *Id.* at 444. Thus, a defendant may challenge the validity of a third-party subpoena only if he demonstrates a reasonable expectation of privacy in the contents of the documents subpoenaed. *See id.* at 442. Absent such a showing, a defendant lacks standing to challenge the subpoena, even if it is invalid. *See id.* at 442 n.2 ("We see no reason why the existence of a Fourth Amendment interest turns on whether the subpoena is defective. Therefore, we do not limit our consideration to the situation in which there is an alleged defect in the subpoena . . . .").

In *Miller*, the Supreme Court denied standing to challenge a third-party subpoena to individuals who asserted a constitutionally protected privacy interest in their bank records. *Id.* at 440-47. In *Smith v. Maryland*, the Court extended the same reasoning to telephone records. 442 U.S. 735, 744 (1979) ("When he used his phone, [the defendant] voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of

business. In so doing, [he] assumed the risk that the company would reveal to police the numbers he dialed."). The same rationale has since been applied where a defendant sought to assert a privacy interest in his electricity bills. *See United States v. McIntyre*, 646 F.3d 1107, 1111-12 (8th Cir. 2011) ("[W]hen [the defendant] used power in his home, he voluntarily conveyed that information to [the utility company]. As a result, he had no reasonable expectation of privacy in his power records."), *cert. denied*, 132 S. Ct. 1614 (2012); *accord United States v. Suing*, 2011 WL 4711985, at *6 (D. Neb. Sept. 30, 2011) (finding that the defendant had no reasonable expectation of privacy in records held by his internet service provider). The logical conclusion from these cases is that, in the context of third-party subpoenas, there is no Fourth Amendment protection against the compulsory production of public records by third parties.

In arguing that he does have standing to contest the subpoena, Thomas relies heavily on an "open records decision"[6] issued by the Kentucky Attorney General in 1996. That decision addressed a request under the Kentucky Open Records Act, Ky. Rev. Stat. § 61.870 *et seq.*, for copies of the monthly water and sewage bills paid by several businesses. *In re: Don Wiggins/Winchester Mun. Utils.*, 96-ORD-176, 1996 WL 506691 (Aug. 20, 1996). The utility company denied the request based on the

---

[6] When a state public agency denies a request to inspect a public record, the Kentucky Open Records Act gives the Attorney General the authority to review the request and the agency's denial. *See* Ky. Rev. Stat. § 61.880(2)(a). Notably, the Attorney General's statutory authority in this regard is limited to determining "whether the agency violated provisions of [the Kentucky Open Records Act]." *Id.*; *see also Courier-Journal, Inc. v. Lawson*, 307 S.W.3d 617, 621 (Ky, 2010) ("The [Attorney General]'s only role in the typical case is to issue a formal opinion about whether the custodial agency acted properly in declining to comply with the open records request."). The Attorney General's written decisions are published as "open records decisions" in the same manner as are opinions of the Kentucky Attorney General and "open meeting decisions," which deal with complaints that a state public agency violated the Kentucky Open Meetings Act, Ky. Rev. Stat. § 61.800 *et seq*.

personal privacy exception in Ky. Rev. Stat. § 61.878(1)(a), which excludes from inspection "[p]ublic records containing information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy." The Kentucky Attorney General agreed with the utility, concluding that "it is not unreasonable to assume that [the utility's] customers have at least some expectation of privacy in their billing records" and that this interest outweighs the public's interest in disclosure. *Id.* at *2-3.

Thomas's reliance on this open records decision is misplaced for several reasons. First and most importantly, Thomas points to no authority suggesting that a federal district court's analysis of privacy interests under the Fourth Amendment is somehow bound by a state's attorney general's open records decision—indeed, the Sixth Circuit, this Court, and even the Kentucky Supreme Court all have recognized that opinions of the Kentucky Attorney General, though persuasive, do not have the force of law. *See, e.g.*, *G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623, 631-32 (6th Cir. 2013); *Grace v. LVNV Funding, Inc.*, --- F. Supp. 2d ---, 2014 WL 2167487, at *3 n.15 (W.D. Ky. May 23, 2014); *White v. Conway*, 2013 WL 593718, at *3 (W.D. Ky. Feb. 15, 2013); *Carter v. Smith*, 366 S.W.3d 414, 420 n.2 (Ky. 2012). Second, the decision Thomas relies on is inapposite here. That decision dealt with whether a private individual could obtain utility records for several businesses under Kentucky's open record laws; it did not address whether police could obtain a subpoena to inspect a criminal suspect's utility records. Third, in the matter before the Attorney General, the utility company asserted its customers' privacy interests on its customers' behalf. In a separate open records decision also issued in 1996, the

Attorney General expressly stated: "The Attorney General does not have authority to entertain a third party claim that disclosure of public records would constitute a clearly unwarranted invasion of personal privacy, or is inconsistent with any of the other exemptions codified [in the Kentucky Open Records Act, Ky. Rev. Stat. § 61.878(1)(a)-(l)]." *In re: Allen K. Gailor/Office of the Attorney Gen.*, 96-ORD-148, 1996 WL 437954, at *1 (July 1, 1996). Thus, if anything, these decisions actually support the notion that Thomas lacks standing.

Accordingly, in view of *Miller*, *Smith*, and *McIntyre*, the Court concludes that Thomas lacks standing to challenge the subpoena issued to Inter County Energy because he has failed to demonstrate that he possesses a legitimate expectation of privacy in the information contained in his electrical bills. When Thomas used electricity at his home, he voluntarily conveyed information concerning his electrical usage to Inter County Energy. Based on Detective Begley's discussion with Inter County Energy's employees, it is clear that those employees had ready access to Thomas's electrical bills. It also is clear that Thomas knew those employees had access to his information. As such, Thomas's electrical bills were as much public records as the bank records in *Miller* or the phone records in *Smith*, and, therefore, do not merit protection against compulsory production by third parties. This conclusion would be unaffected if, as Thomas argues, the subpoena itself were defective. *See United States v. Phibbs*, 999 F.2d 1053, 1077-78 (6th Cir. 1993) (explaining that the court's decision to deny the defendant standing for lack of a legitimate privacy interest in credit card statements and phone records: "would not have been different if the government had infringed upon the constitutional rights of

those entities subpoenaed. One generally does not have standing to complain about the breach of another's rights."); *see also Miller*, 425 U.S. at 442 n.2. Thus, while Inter County Energy might have had standing in the case of a defective subpoena, Thomas certainly does not.

**III.     The Investigating Officers Had Probable Cause to Obtain the Search Warrant for Thomas's Property, and Even if the Warrant Was Defective, the Officers Acted in Objective Good Faith.**

Finally, Thomas argues that police nonetheless had insufficient evidence to establish probable cause. The Court found above that police had probable cause to search Thomas's vehicle. The Court now finds that police also had probable cause to obtain the search warrant for Thomas's property.

As noted above, the Fourth Amendment protects individuals against unreasonable searches. To protect that interest, the Fourth Amendment requires that a search warrant issue only upon a showing of probable cause. *E.g.*, *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause for a search warrant exists where, based on the totality of the circumstances, the affidavit in support of the warrant provides the issuing magistrate a "substantial basis . . . to believe 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. McNally*, 327 F. App'x 554, 556 (6th Cir. 2009) (quoting *Gates*, 462 U.S. at 238); *United States v. King*, 227 F.3d 732, 742 (6th Cir. 2000)). "To justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). That is, there must be a "nexus between the place to be searched and the evidence sought." *Id.* (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37

(6th Cir. 1998)). Thus, in order for a magistrate to determine probable cause, "the affidavit must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of warrant." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (citing *Whitely v. Warden*, 401 U.S. 560 (1971)). Those supporting facts need not necessarily be based on the affiant's direct knowledge or observations. *Id.* (citing *Jones v. United States*, 362 U.S. 257, 269-70 (1960)).

To deter future violations of the Fourth Amendment, the usual remedy for searches made with a defective warrant is suppression. *E.g.*, *United States v. Woodbury*, 511 F.3d 93, 99 (1st Cir. 2007). However, suppression is not always warranted, and evidence may be saved from suppression where an officer acts in objective good faith in executing an otherwise defective warrant. *United States. v. Leon*, 468 U.S. 897, 905, 922 (1984). In situations where "evidence [is] obtained in objectively reasonable reliance on a subsequently invalidated search warrant," the "marginal or nonexistent benefits produced by suppressing evidence . . . cannot justify the substantial costs of exclusion." *Id.* at 922; *accord United States v. Richards*, 659 F.3d 527, 542 (6th Cir. 2011). Still, there are four exclusions to *Leon*'s good-faith exception: (1) "when the magistrate . . . was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"; (2) "where the issuing magistrate wholly abandoned his [detached and neutral] judicial role"; (3) where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where a warrant is "so facially deficient—i.e., in

failing to particularize the place to be searched or the thing to be seized—that the executing officers cannot reasonable presume it to be valid." *Leon*, 468 U.S. at 923.

Based on the totality of the circumstances here, the affidavit in support of the search warrant provided the Marion County District Judge a substantial basis to believe there was a fair probability that contraband or evidence of a crime would be found at Thomas's residence. Thus, the Court finds no violation of the Fourth Amendment on grounds that the search warrant was issued without probable cause. But even assuming the warrant was defective, it appears to the Court that the officers executing the warrant acted in good faith reliance on its validity. Therefore, because none of the four *Leon* exceptions are applicable here, suppression would not be warranted, even if the search of Thomas's property had been made with a defective warrant.

## CONCLUSION

Having considered Thomas's Motion and being otherwise sufficiently advised, for the foregoing reasons;

IT IS HEREBY ORDERED that Defendant Eric Thomas's Motion to Suppress, (Docket No. 18), is DENIED.

 IT IS SO ORDERED.

Date:

cc: AUSA
    Counsel for Defendant